**Ronald L. BACON and Becky Ann Bacon, Plaintiffs–Respondents,**

v.

**Michael J. UHL, Sr. and Bonnie M. Uhl, Defendants–Appellants.**

No. 26718.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 12, 2005.

Barbara R. VanTine, Lake Ozark, MO, for Appellants.

Clarence W. Hawk, Osage Beach, MO, for Respondents.

JEFFREY W. BATES, Chief Judge.

Ronald and Becky Bacon ("the Bacons") brought an action to recover on a promissory note after the obligors, Michael and Bonnie Uhl ("the Uhls"), stopped making payments and went into default. The trial court entered judgment in favor of the Bacons for approximately $269,000. The Uhls have appealed. They contend the trial court erred by: (1) failing to offset the value of certain stock, which was pledged as collateral for the loan, against the balance due on the note; (2) refusing to allow the Uhls to make an offer of proof regarding their expert's testimony about the stock's value; and (3) awarding attorney's fees to the Bacons without requiring proof that the sum requested was reasonable. Finding no merit in any of these contentions, we affirm.

## I. Facts and Procedural History

In 1990, the Bacons established a real estate business in Osage Beach, Missouri. The business was incorporated under the name of Ron Bacon Realty, Inc. ("RBRI"). The Bacons were RBRI's only shareholders and directors. RBRI's business operations were conducted in an office building located in Osage Beach. The Bacons owned the land and the building individually.

In May 1996, the Bacons sold their real estate business to the Uhls. The Uhls purchased the office building and real estate for $350,000 on a contract for deed. To finance the real estate purchase, the Uhls executed a promissory note ("the real estate note") made payable to the Bacons in the amount of $350,000. The Uhls also purchased all of the Bacons' shares of stock in RBRI for $250,000. To finance the stock purchase, the Uhls executed a promissory note ("the stock note") made payable to the Bacons in the amount of $250,000. The stock note obligated the Uhls to make a $2,389.14 installment payment on the first day of each month for 15 years. The interest rate on the stock note was 8% per annum. Nonpayment for 60 days constituted an act of default and triggered an acceleration clause, which made the remaining balance of the stock note due and payable. Upon default, the stock note obligated the Uhls to pay reasonable attorney's fees and all costs of collection. The stock note provided that it was to be secured "by all outstanding shares of stock in Ron Bacon Realty, Inc." To that end, the Uhls executed a separate agreement which pledged the RBRI stock as collateral to secure payment of the stock note.

The Bacons assigned their shares of RBRI stock to the Uhls, but the Bacons retained physical possession of the stock certificates pursuant to the terms of the stock pledge agreement.

From May 1996 through August 2001, the Uhls made all required payments on the real estate note and the stock note. That changed in September 2001 when the Uhls stopped making payments on the stock note. In October 2001, the Uhls also stopped making payments on the real estate note. They closed the real estate business on December 31, 2001. At some point not disclosed by the record, RBRI was administratively dissolved.

When the Bacons repossessed the RBRI office building and land in January 2002, they found some personal property there that had been abandoned by the Uhls.[1] The Bacons kept the property, but they had it appraised so they could credit the value of the property against the amount due on the stock note. The appraised value of the Uhls' personal property was $3,226.[2] After repossessing the RBRI premises, the Bacons went back into the real estate business themselves. They operated as a sole proprietorship until February 20, 2002. At that point, they incorporated a new Missouri corporation called Ron Bacon Real Estate, Incorporated. The Bacons continued to keep possession of the old RBRI stock certificates, which were not sold, reissued in the Bacons' names or modified in any manner.

After the Uhls had been in default on the stock note for more than 60 days, the Bacons turned the note over to an attorney for collection. The Bacons' attorney presented the Uhls with a notice of default

---

1. This appeal does not involve any issue concerning the contract for deed or the real estate note.

2. The Bacons also paid advertising, printing and tax debts owed by RBRI in the amount of approximately $15,000. The Bacons did not include these debts when calculating the amount due on the stock note.

and made demand for payment. Thereafter, the Bacons filed an action to recover on the stock note. The Bacons' petition alleged that they were entitled to recover the outstanding balance of the stock note, costs of collection and reasonable attorney's fees. In the Uhls' answer to the petition, they denied that they owed anything because the value of the RBRI stock, which was in the Bacons' possession, exceeded the amount of the Uhls' remaining indebtedness on the stock note. Some months later, the Uhls filed a counterclaim against the Bacons. The counterclaim alleged that: (1) the Bacons could not pursue their action to collect the stock note because they claimed ownership of the RBRI stock that had been pledged as collateral to secure the loan; (2) the Bacons tortiously interfered with the Uhls' business; (3) the Bacons breached their contract with the Uhls; and (4) the Bacons converted the Uhls' property.

In the course of the lawsuit, considerable discovery was conducted by the Bacons' attorney on the issues raised by the Uhls' answer and counterclaims. Several depositions were taken, and paper discovery in the form of interrogatories, requests for production and requests for admissions were propounded. The Uhls also filed a motion for summary judgment, which required the Bacons to respond. The trial court ultimately denied the motion.

On June 2, 2004, the court set the case for a bench trial commencing on September 14–15, 2004. The Bacons' initial discovery requests to the Uhls included a standard interrogatory asking the Uhls to disclose the identity of any expert whom they expected to call as a witness at trial. None was identified. Over one month pri-

or to trial, the Bacons' attorney sent out a formal request asking the Uhls to supplement their discovery responses. On September 9, 2004, the Uhls' attorney faxed a letter to the Bacons' attorney disclosing, for the first time, the identity of an expert. The letter advised the Bacons that the Uhls intended to call an expert witness to testify about the value of the RBRI stock. The expert identified in the fax was Larry Weber, a certified public accountant from St. Louis, Missouri.

On September 14th, the trial commenced as scheduled. All of the Uhls' counterclaims had been dismissed without prejudice by that time, but the Uhls still contended that they owed nothing on the stock note because the RBRI stock was worth more than what they owed on the stock note. Before the presentation of evidence, the Bacons moved to suppress Weber's testimony because the Uhls had not disclosed their expert's identity in a timely fashion. The court took the matter under advisement for a later ruling.

■ In the Bacons' case-in-chief, they established their *prima facie* case by: (1) having the stock note admitted in evidence; (2) introducing a stipulation by the Uhls that they signed this document; and (3) having Mr. Bacon testify that the unpaid principal balance of the stock note on October 1, 2001, was $192,566.26.[3] An amortization schedule for a $250,000 note at 8% interest was admitted in evidence to assist the court in determining the principal and interest due on the stock note as of the trial date. Collection costs in the case totaled $819.65 and were comprised of a $150.00 filing fee and $669.65 in deposition costs. Mr. Bacon testified that he and his wife had incurred attorney's fees totaling

---

**3.** "In a suit on a promissory note a prima facie case is made when the note, admittedly signed by the makers, is introduced and evidence follows demonstrating the note is un- paid or that a balance is due and owing." *Bank of Kirksville v. Small*, 742 S.W.2d 127, 130 (Mo. banc 1987).

$29,793. They had paid $19,642 of the amount due, but they still owed $10,151 for services provided through September 13, 2004. They had not yet been billed for their attorney's services during the trial itself.

The remainder of the evidence adduced in the Bacons' case-in-chief addressed the issue of what credits, if any, the Uhls should receive in determining the amount owed on the stock note. Mr. Bacon testified that when he and his wife repossessed the office building, RBRI had no assets other than the abandoned personal property located therein. The Bacons agreed that the value of this property should be offset against the unpaid balance on the stock note. In Mr. Bacon's opinion, the RBRI stock which the Bacons held as collateral for the stock note was worthless. Nevertheless, Mr. Bacon asked the court to determine that the Bacons were the legal owners of Uhls' stock certificates, which had been pledged as collateral to secure the stock note. Although the stock had no value, ownership of it would permit the Bacons to claim a $1,300 real estate commission that was being held in escrow pending the outcome of an arbitration proceeding.[4]

The Bacons also presented admissions from the deposition of Michael Uhl. Mr. Uhl admitted that he nearly lost the business in 1996 after he and his wife first acquired RBRI. The year 2000 also was bad for RBRI, and business got even worse after September 11, 2001. This latter downturn in business is what prevented the Uhls from making timely payments on the stock note. RBRI was operating at a loss in 2001, and the Uhls had to close

the business because they weren't making any sales. They were unable to obtain a bank loan to refinance the stock note because RBRI had no assets to secure such a loan. The Uhls were unable to secure a personal loan for the same reason.

In the Uhls' case-in-chief, Mr. Uhl was called as a witness. He testified that the RBRI stock was worth $400,000 when the business closed its doors on December 31, 2001. On cross-examination, Mr. Uhl conceded that RBRI's tax returns showed it made a profit of $14,888 in 1999 and $34,000 in 2000. The company lost $11,330 in 2001. Mr. Uhl also conceded that, when asked during discovery to provide any documents reflecting the value of the RBRI stock, he produced only RBRI's 2001 tax return. This document confirmed that RBRI lost over $11,000 in 2001. The personal property that RBRI owned that year was only worth $3,900. During the Uhls' case-in-chief, they made no attempt to challenge the amount of attorney's fees being requested by the Bacons.[5]

At the close of the Uhls' case, the trial court took up the issue of whether Weber should be permitted to testify. The Bacons objected on the ground that they had asked the Uhls to identify their experts in discovery, and Weber's name was not disclosed until approximately four days before trial. The Uhls had failed to disclose Weber's name even after the Bacons made a formal request for supplemental discovery responses on August 5, 2004. The trial court sustained the objection on the ground that Weber had not been timely disclosed as an expert witness. The Uhls then asked to make an offer of proof con-

---

4. This $1,300 real estate commission was the subject of an arbitration proceeding being conducted by the Missouri Association of Realtors. If the commission belonged to RBRI, it would only be paid to the persons holding legal title to RBRI's stock.

5. In that regard, it is appropriate to point out that Mr. Bacon had not been asked a single question about the subject of attorney's fees during his cross-examination.

cerning the testimony they had intended to elicit from Weber. They asserted that Weber's testimony would prove RBRI's stock was worth about $270,000 as of December 31, 2001. The trial court refused the offer of proof.

In November 2004, the court entered an amended judgment in favor of the Bacons. After giving the Uhls a $3,900 credit for the value of the personal property they abandoned on December 31, 2001, the court computed the unpaid principal and interest due on the stock note as of September 14, 2004, and entered judgment for the Bacons on the stock note in the amount of $237,528.94. The court decided the RBRI stock was worthless. Legal ownership of these shares was awarded to the Bacons. The court ruled that the Bacons' ownership of the stock vested upon entry of the judgment; prior to that time, they merely had physical possession of the stock certificates. The court also awarded the Bacons the sum of $31,605 for attorney's fees incurred through September 16, 2004, which the court found to be fair and reasonable. Finally, the court determined the Bacons had incurred $819.65 in collection costs, which were taxed as court costs against the Uhls. This appeal followed.

## II. Standard of Review

 In this court-tried case, our review is governed by Rule 84.13(d).[6] We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Johnston v. Shoults*, 160 S.W.3d 440, 441 (Mo.App.

2005).[7] The trial court's judgment is presumed correct, and the Uhls have the burden of proving it erroneous. *Surrey Condominium Ass'n, Inc. v. Webb*, 163 S.W.3d 531, 535 (Mo.App.2005). "[A]n appellate court should exercise the power to set aside a judgment on the ground that it is against the weight of the evidence with caution and a firm belief that it was wrong." *Lee v. Hiler*, 141 S.W.3d 517, 525 (Mo.App.2004). When we evaluate the weight of the evidence, we mean "its weight in probative value, not the quantity or amount of evidence." *Id.*

 On appeal, we review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *City of Gainesville v. Morrison Fertilizer, Inc.*, 158 S.W.3d 872, 874 (Mo. App.2005). We defer to the trial judge's superior opportunity to assess the witnesses' credibility. *Harris v. Lynch*, 940 S.W.2d 42, 45 (Mo.App.1997). "Judging credibility and assigning weight to evidence and testimony are matters for the trial court, which is free to believe none, part, or all of the testimony of any witnesses." *Savannah Place, Ltd. v. Heidelberg*, 122 S.W.3d 74, 86 (Mo.App.2003).

## III. Discussion and Decision

 In the Uhls' first point, they argue that the trial court's judgment is against the weight of the evidence because the court incorrectly determined ownership of the RBRI stock and failed to take the value of the stock into account in determining the amount the Uhls owed on the stock note. Neither argument has any merit.

---

**6.** All references to rules are to Missouri Court Rules (2005).

**7.** *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule

were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

■ The first prong of the Uhls' argument demonstrates a basic misunderstanding of the clear legal distinction between a share of stock and a stock certificate. A share of stock is a unit of interest in a corporation and is the actual property of the shareholder. *Vandivort v. Dodds Truck Line, Inc.*, 444 S.W.2d 229, 230 n. 1 (Mo.App.1969). A stock certificate, on the other hand, is merely tangible evidence of title to shares of stock. *Id.* As best we comprehend the Uhls' argument, they contend the Bacons were always the legal owners of the stock because they always possessed the stock certificates. That is simply not correct. When the Uhls executed the stock note, they contemporaneously executed the stock pledge agreement. This agreement pledged the RBRI stock as collateral to secure the stock note, and it authorized the Bacons to hold the RBRI stock certificates they had assigned to the Uhls. As the trial court correctly decided, retaining physical possession of the stock certificates as collateral did not make the Bacons the legal owners of the stock. Similarly, the Uhls' default on the stock note did not, *ipso facto*, make the Bacons the legal owners of the stock. Although the stock pledge agreement authorized the Bacons, in their sole discretion, to repledge the stock, transfer the stock into their names, sell the stock, etc., in the event of a default on the stock note, it did not require them to do so. The evidence presented at trial definitively proved the Bacons chose not to avail themselves of any such cumulative remedies. Instead, they continued to hold the stock certificates as collateral, and they asked for a judicial determination of the stock's ownership as a part of their action to recover on the stock note. We discern no error whatsoever in the trial court's decision to award legal ownership of the stock, as of the effective date of the judgment, to the Bacons.

■ The second prong of the Uhls' argument is equally baseless. They charge the trial court with committing error by failing to mitigate the Bacons' damages by applying the value of the stock against the amount the Uhls owed on the stock note. They acknowledge that the court found the stock to be worthless, but they contend this finding is against the weight of the evidence. The Uhls base their argument on Mr. Uhl's testimony that the stock was worth $400,000 as of December 31, 2001. The trial court evidently disbelieved Mr. Uhl, which was the court's prerogative. That decision is entirely understandable since: (1) RBRI was then out of business; (2) the company had been operating at a loss during 2001 and had made only marginal profits the two previous years; (3) the corporation's tangible assets were worth only $3,900; (4) several banks had declined to loan RBRI any money since it had nothing of value to secure the loan; and (5) these same banks had declined to loan any money to the Uhls because they had nothing of value— including their RBRI stock—to secure the loan. We defer to the trial court's determination that Mr. Uhl's testimony as to the value of the stock was not credible. Finally, we reject the Uhls' argument that the stock must have value because the Bacons retained possession of the certificates and asked to be declared the legal owners of the shares. The answer to this argument is apparent from the record. Although the shares of stock had no intrinsic value themselves, ownership of the shares carried with it the right to make a claim on the $1,300 real estate commission that was the subject of a pending arbitration proceeding.[8] The Uhls' first point is denied.

---

8. Since the arbitration proceeding was ongoing, the trial court had no way of determining

In the Uhls' second point, they contend the trial court erred by refusing to permit an offer of proof regarding their expert's testimony as to the value of the stock since "the value of the stock was a critical issue at trial." The Uhls argue that the trial court should have permitted this offer of proof so there would be an adequate record of the testimony being excluded for this appeal. The Uhls' argument is misdirected because it utterly fails to address the reason why Weber's testimony was excluded: the Uhls' failure to timely disclose their expert's identity during discovery. To put a finer point on the issue presented, the trial court's failure to permit the Uhls to make an offer of proof cannot possibly have any bearing on the outcome of this appeal unless the Uhls first establish that the trial court erred in excluding Weber's testimony as a sanction for the Uhls' violation of discovery rules.

Untimely disclosure of an expert witness' identity is so offensive to the underlying purposes of the discovery rules that prejudice may be inferred. *Wilkerson v. Prelutsky*, 943 S.W.2d 643, 649 (Mo. banc 1997). For this reason, trial courts have broad discretion to exclude an expert witness whose identity is not timely disclosed. *Goede v. Aerojet General Corp.*, 143 S.W.3d 14, 23 (Mo.App.2004). We review the court's ruling for an abuse of discretion. *Id.* "An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Hancock v. Shook*, 100 S.W.3d 786, 795 (Mo. banc 2003).

At trial, the Uhls offered no explanation or justification for not disclosing their expert's identity until four days before trial. Similarly, we find none in their appellate brief, even though the Uhls characterize Weber's testimony as being directed to a "critical issue" in the case. The Uhls have ignored the underlying basis for the trial court's ruling in order to pursue a red herring argument that the trial court's error lies in not permitting the offer of proof. We believe the following quotation explains why the Uhls' argument is unsound:

> An offer of proof is required when evidence is excluded on evidentiary grounds. The Commission's objection was not directed at the content or quality of Sandbothe's testimony. Its objection essentially argued that relevant evidence must be excluded as a sanction. The court agreed. In such cases an offer of proof is meaningless. The complete exclusion of what may have been probative evidence without consideration of whether it would be admissible, removes the need for an offer of proof to fully inform the trial court on matters of admissibility. Offers of proof are irrelevant when refusing testimony as a sanction.

*State ex rel. Missouri Highway and Transp. Comm'n v. McDonald's Corp.*, 872 S.W.2d 108, 114 (Mo.App.1994).

Since the Uhls did not timely disclose Weber as an expert or present any justification for their delay, the trial court acted within its discretion in excluding Weber's testimony as a sanction for the Uhls' failure to comply with the rules of discovery.

---

whether RBRI would recover the disputed commission or what arbitration expenses the Bacons would incur if they were ultimately successful. Furthermore, we find no argument in the Uhls' brief that the stock must be valued at $1,300 simply because the disputed commission might someday be recovered by RBRI. Accordingly, we find no error in the trial court's conclusion that, as of the date of trial, the RBRI stock was worthless.

*Wilkerson,* 943 S.W.2d at 649. That being the case, we certainly cannot convict the trial court of error in refusing to permit the Uhls to make a meaningless offer of proof. The Uhls' second point is denied.

 In the Uhls' third point, they challenge the trial court's decision to award the Bacons $31,605 in attorney's fees. The Uhls argue the trial court erred because the record contains no evidence that the sum awarded was reasonable in this "fairly simple breach of contract matter." We disagree.

 A trial judge is considered to be an expert on the subject of attorney's fees. *Nelson v. Hotchkiss,* 601 S.W.2d 14, 21 (Mo. banc 1980); *Villines v. Mier,* 58 S.W.3d 921, 925–26 (Mo.App.2001); *see H.S. v. Board of Regents, Southeast Missouri State University,* 967 S.W.2d 665, 674 (Mo.App.1998). A judge who tries the case and is acquainted with the issues may fix the amount of fees without the aid of evidence. *Nelson,* 601 S.W.2d at 21. No evidence or other opinion as to the value of the services is necessary because the judge "knows the nature of the work the presentation of the cause entails, the issues, the quality of the professional labor, the expenditure of time, and, thus, its value assessed according to custom, place and circumstances." *Heilbron v. ARC Energy Corp.,* 757 S.W.2d 294, 296–97 (Mo.App. 1988). Setting the amount of attorney's fees to be awarded is within the trial court's sound discretion and should not be reversed unless the award is determined arbitrarily or is so unreasonable as to indicate indifference and the lack of proper judicial consideration. *Miller–Stauch Const. Co. v. Williams–Bungart Elec., Inc.,* 959 S.W.2d 490, 496 (Mo.App.1998).

The award in this case did not constitute an abuse of discretion. The judge who determined the Bacons' award of attorney's fees had tried the case and was familiar with the issues. It is evident from the record that much of the work done in this case by the Bacons' attorney was necessitated by the Uhls' persistent denial that they owed anything on the stock note and by their attempt to pursue affirmative relief, in the form of a counterclaim, against the Bacons. It was the Uhls who converted what should have been a simple action on a promissory note into a much more complicated lawsuit. Moreover, all of the Uhls' machinations were for naught. Their counterclaim was dismissed without prejudice before the trial even began. Their only remaining defense—that the RBRI stock was worth more than the remaining balance of the stock note—was an abject failure because the stock was found to be worthless. The judge had a right to consider these facts in assessing appropriate attorney's fees.

 We also note that, even though evidence on the subject of attorney's fees is not required, there was proof that the Bacons had incurred $29,793 in attorney's fees as of September 13, 2004. This evidence was not challenged in any manner by the Uhls. The total amount awarded to the Bacons as attorney's fees was $31,605. Therefore, the judge only awarded the Bacons about $1,800 more for the services their attorney provided in trying the case and handling any post-trial matters. The judge made a specific finding that the amount awarded was fair and reasonable. Contrary to the Uhls' argument, it was not necessary that there be evidence of reasonableness in the record to support that finding. A trial court is an expert on the reasonableness of attorney's fees. *Price v. American Bank of St. Louis,* 793 S.W.2d 593, 598 n. * (Mo.App.1990). Accordingly, a judge may award fees "even though no evidence of reasonableness is introduced."

*O'Brien v. B.L.C. Ins. Co.*, 768 S.W.2d 64, 71 (Mo. banc 1989); *see also Campbell v. Kelley,* 719 S.W.2d 769, 772 (Mo. banc 1986) (where the terms of a promissory note provide for attorney's fees, a trial court may award reasonable fees as a matter of law because the court is an expert on fees). The Uhls' third point is denied.

The judgment of the trial court is affirmed.

GARRISON and BARNEY, JJ., Concur.